OPINION OF THE COURT
Albert Tomei, J.
In an omnibus motion filed on January 21, 1997, the defendant requests numerous orders and hearings. The People filed papers in opposition, and the defendant filed a reply. Oral argument was heard on the motions. The defendant’s motions are resolved as follows:
I. MOTION TO DISMISS THE INDICTMENT
Motion to Dismiss pursuant to CPL 210.25 (1)
The defendant moves to dismiss the indictment pursuant to CPL 210.25 (1) on the grounds that (1) counts one, two, three, five, and six are multiplicitous; and (2) count one improperly "double-counts” the victim’s death.
Counts one and two — Multiplicity
The defendant contends that the first two counts of the indictment, each of which charges murder in the first degree, must be considered multiplicitous because they are predicated upon the same aggravating factor — robbery—albeit in different degrees. Furthermore, the defendant claims that count one, charging robbery in the first degree as the aggravating factor, improperly "double-counts” the victim’s death as an "intentional killing” and as "serious physical injury”.
The People assert that these counts do not render the indictment multiplicitous because each requires proof of an additional fact that the other does not, and because they may be considered to be "akin” to lesser included offenses.
An indictment is multiplicitous when two or more separate counts charge the same crime. (See, People v Kindlon, 217 AD2d 793, 795 [3d Dept 1995], citing People v Senisi, 196 AD2d 376, 382 [2d Dept 1994].) An indictment is not considered multiplicitous if each count requires proof of an additional fact that the other does not. (People v Kindlon, 217 AD2d, at 795, citing Blockburger v United States, 284 US 299, 304.)
In our death penalty statute, the aggravating factors that elevate a murder to the status of a crime worthy of the death penalty are prescribed in the definition of the offense itself. Thus, Penal Law § 125.27 (1) (a) (vii) provides that a person is *152 guilty of murder in the first degree when, with the intent to cause the death of a person, he causes the death of that person or a third person, and "the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of” certain enumerated felony offenses, including robbery. (See, Penal Law § 125.27 [1] [a] [vii].)[1] The Legislature chose to include only certain degrees of the enumerated felonies, except for robbery, which is listed without reference to the degree of the offense.[2]
Count one of the indictment in the instant case charges the defendant with murder in the first degree, with robbery in the first degree as the aggravating factor. Count two charges the defendant with murder in the first degree, with robbery in the third degree as the aggravating factor. (See, Penal Law § 125.27 [1] [a] [vii].) Both counts are predicated upon the same alleged conduct. The only difference between the two counts as charged is in the degree of the robbery. Should the People prove count one, they will have also necessarily proven count two, since it would have been impossible for the defendant to have committed an intentional killing in the course of a first degree robbery without concomitantly committing an intentional killing in the course of a third degree robbery.
Thus, it appears that counts one and two charge the same crime — murder in the first degree predicated upon the felony of robbery — and are, therefore, multiplicitous.[3] Indeed, by specifying robbery, without reference to degree, as a felony that may form the basis for an aggravating factor, the *153 Legislature apparently did not intend to permit multiple charges of murder in the first degree predicated upon different degrees of robbery arising out of the same occurrence. That the Legislature chose to describe by degrees all of the other felonies enumerated in Penal Law § 125.27 (1) (a) (vii) adds force to this argument.
The crime of murder in the first degree with robbery as the felony aggravating factor requires proof of the intentional killing of the victim in the course of or in furtherance of the defendant’s commission of the crime of robbery. As to the underlying felony, it does not require proof of any facts additional to those required for simple robbery, i.e., forcible stealing. (See, Penal Law § 160.00.) Thus, any reference in the indictment to the degree of the robbery must be considered mere surplusage. (See, People v Killane, 203 AD2d 386, 387 [2d Dept 1994] [specification in indictment that defendant engaged in an "illegal speed contest”, as defined in Vehicle and Traffic Law § 1182, was a nonessential factual recital that the People were not required to prove to establish offense of criminally negligent homicide]; see also, Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 200.50 [where indictment alleges more than is necessary to support offense charged, prosecution need prove only facts necessary for conviction, and balance of factual allegations may by disregarded as surplusage].)
Multiplicity may be remedied either by an election of counts by the prosecution, or by the court’s decision to charge only one of the multiplicitous counts to the jury (see, People v Horne, 121 Misc 2d 389, 394 [Kings County 1983], citing United States v Brandom, 320 F Supp 520, 525). In this capital case, it is the court’s opinion that the preferred practice is to cure the defect before trial, and in so doing, eliminate any prejudice in the penalty phase — assuming there is to be one — that might accrue from the jury’s consideration of redundant aggravating factors during the guilt phase of the proceedings.
Therefore, the court orders the dismissal of count one, charging murder in the first degree, with robbery in the first degree as the aggravating factor.[4] Count two will remain in effect.
*154 Counts two, three, five and six — Multiplicity and double-counting
Counts two and three charge murder in the first degree, with robbery and kidnapping in the first degree as the respective aggravating factors. Counts five and six charge murder in the second degree (felony murder), with the same respective crimes serving as the underlying felonies. The defendant asserts that these charges render the indictment multiplicitous because "multiple felonies underlying the same murder were not meant to authorize multiple charges under P.L. § 125.27(a)(vii)” or multiple charges of felony murder under Penal Law § 125.25 (3).[5]
In support of this argument, insofar as it applies to the first degree murder counts, the defendant cites CPL 400.27 (3), which provides, in pertinent part, that "each subparagraph of paragraph (a) of subdivision one of section 125.27 of the penal law shall be deemed to define an aggravating factor.” (See, CPL 400.27 [3].) According to the defendant, because the enumerated felonies are contained within subparagraph (vii), rather than listed in separate subparagraphs, the Legislature did not intend for each of them to constitute a separate aggravating factor. Therefore, he reasons, all but one of the capital murder counts must be dismissed. As additional support for this argument, the defendant points out that a number of States make "murder during a felony” a single aggravating factor in their death penalty statutes.
The People counter that the defendant’s construction of the statute artificially restricts the statement of the charges so that they are not reflective of his criminal conduct. Moreover, according to the People, that other States treat felony aggravators differently does not lead to the conclusion that the New York Legislature so intended to limit the aggravators in the New York statute.
The court rejects the defendant’s claim that the contested counts are multiplicitous. The counts at issue have different elements that require proof of additional facts that the others do not. The second count, charging murder in the first degree, requires proof that the alleged intentional killing took place in *155 furtherance of a robbery, while the third count, also charging murder in the first degree, requires proof that the alleged intentional killing took place in furtherance of the crime of kidnapping in the first degree. Similarly, the felony murder counts — five and six — require proof pertaining to different underlying felonies: robbery and kidnapping, respectively. For the purpose of determining multiplicity, it does not matter that the charges arose out of the same conduct, so long as each charge requires proof of an additional fact that the other does not. (See, e.g., People v Velez, 206 AD2d 258 [1st Dept 1994]; People v Johnson, 89 AD2d 814 [4th Dept 1982] [while not addressing multiplicity directly, both decisions let stand multiple convictions for felony murder premised upon different underlying felonies arising out of the same criminal transaction, but held that sentences must run concurrently].)
Furthermore, the court is unpersuaded by the defendant’s argument that, by listing a series of felonies together within 1 of the 12 subparagraphs of aggravating factors, rather than listing each of the felonies in a separate subparagraph, the Legislature intended to permit the charging of only one count of murder in the first degree premised upon the commission of an intentional killing in the course of a felony, whether or not the defendant, in fact, committed an intentional killing in the furtherance of multiple felonies.[6]
The aggravating factors that elevate a murder to death penalty eligible status are provided in Penal Law § 125.27 (1) (a) (i)-(xii). CPL 400.27 (3), entitled "Procedure for determining sentence upon conviction for the offense of murder in the first degree”, provides that "[f]or the purposes of a proceeding under *156 this section [i.e., the penalty phase] each subparagraph of paragraph (a) of subdivision one of section 125.27 of the penal law shall be deemed to define an aggravating factor.” In the defendant’s view, it is the phrase "an aggravating factor” which mandates that an indictment may charge only one count of murder in the first degree predicated upon subparagraph (vii). To conclude otherwise, says the defendant, would improperly skew the penalty decision in favor of death by allowing duplication of a single aggravating factor. The People counter by arguing that the Legislature must have intended to permit separate charges arising out of different underlying felony aggravators because to limit multiple felonies to a single aggravator would, in essence, hold the defendant blameless for all but one of the felonies.
It cannot be the law that, regardless of the number of felonies in furtherance of which an intentional killing is committed, the People are bound to charge only a single count of murder in the first degree. Limiting the charges in this way would preclude the jury’s proper and due consideration of the full breadth of the defendant’s alleged criminal conduct. That the statute specifies 12 different felonies that may serve as the underlying felony for a subparagraph (vii) aggravator evinces the Legislature’s intent to make the commission of an intentional killing in the furtherance of any one of these felonies a crime worthy of the death penalty. To force the People to elect to proceed on an indictment charging only one count of murder in the first degree premised upon only a single felony, even though the defendant’s conduct constituted several of the enumerated felonies, would rob the People of the opportunity to prove the defendant’s guilt of murder in the first degree in furtherance of any 1 of the 12 enumerated felonies, as contemplated by the statute.
That the Legislature chose to list the felony aggravators in one subparagraph does not lead to a contrary conclusion. Had the Legislature intended to permit only a single charge of murder in the first degree for "intentional murder in the course of a felony” without reference to specific felonious conduct, as the defendant suggests, the Legislature could have said as much. Instead, by listing specific felonies, the Legislature plainly evinced its intent to permit multiple charges of first degree murder premised upon an intentional killing in the course of any one or more of the specified felonies. The Legislature’s decision to place all of the felony aggravators in a single subparagraph reflects an attempt to make the statute as *157 concise as possible: by listing the felony aggravators together, the Legislature kept the number of subparagraphs in Penal Law § 125.27 (1) (a) to 12, rather than the 24 that would have been required to list each felony separately. This court is not convinced that Penal Law § 125.27 (1) (a) (vii) was constructed to unduly and artificially restrict the proof of the defendant’s conduct. (Cf., People v Davis, 165 AD2d 610, 613 [4th Dept 1991] [sanctioning multiple convictions of noninclusory concurrent counts of homicide]; see also, People v Perrin, 56 AD2d 957, 958 [3d Dept 1977] [holding that indictment may state in different counts accomplishment of crime charged in various ways where facts relate to same transaction].)
Therefore, and for the foregoing reasons, the defendant’s motion to dismiss the indictment pursuant to CPL 210.25 (1) is denied, except insofar as count one of the indictment is concerned. That count is dismissed. With regard to counts two and three, the court reserves decision as to whether the jury should be instructed in the penalty phase that these counts constitute separate and distinct aggravating factors, or should be merged into a single aggravating factor.
Motion to Dismiss pursuant to CPL 210.25 (3)
The defendant moves to dismiss the indictment pursuant to CPL 210.25 (3) on the ground that Penal Law § 125.27 (1) (a) (vii) is unconstitutional. Specifically, he claims that the provision is irrationally underinclusive of other potential felony aggravators. In addition, according to the defendant, count three of the indictment, charging murder in the first degree with kidnapping in the first degree as the aggravating factor, impermissibly "double-counts” the victim’s death. Lastly, he claims that counts two and three, charging murder in the first degree, and counts five and six, charging murder in the second degree, are vague and overbroad.
The "Irrationally Underinclusive” Claim
The defendant claims that Penal Law § 125.27 (1) (a) (vii), which defines the felonies that constitute aggravating factors rendering an intentional killing worthy of the death penalty, is arbitrary and capricious because it includes some felonies which, according to the defendant, are not particularly serious, while excluding other felonies which, in the defendant’s view, are more worthy of being aggravating factors making an intentional killing death-eligible.
A capital punishment statute must "genuinely narrow the class of persons eligible for the death penalty and must reason *158 ably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.” (Zant v Stephens, 462 US 862, 877 [1983].) Winnowing death-eligible murders from those not worthy of the ultimate sanction is a task left to the Legislature. (See, Gregg v Georgia, 428 US 153, 175 [1976].) It is not for the courts to second-guess the Legislature’s determination of which factors set apart certain killings as particularly atrocious, so long as that determination limits the application of the death penalty to a subclass of defendants convicted of murder, and the definitions of the aggravating factors are not unconstitutionally vague. (See, Tuilaepa v California, 512 US 967 [1994].)
Upon reviewing Penal Law § 125.27, the court concludes that the statute passes constitutional muster. The statute limits death penalty eligibility to a subclass of murders. None of the aggravators is unconstitutionally vague. In particular, the aggravating factors with which the defendant is charged— robbery and kidnapping in the first degree — are quite clear.
Furthermore, the court cannot say that in defining the felony aggravating factors, the Legislature acted irrationally in choosing some felonies and exempting others. All of the felony crimes included by the Legislature as aggravating factors are crimes involving violence or potential violence, and substantial risk of physical injury. The defendant’s argument that some felonies of a lesser class are included while others of a greater class are left out misses the point.
It is not the class or grade of felony that must necessarily inform the Legislature’s choice. Rather, it may rely on the inherently violent nature of the underlying felony in concluding that it renders an intentional killing in the course thereof worthy of death. For example, grand larceny in the first degree is a class B felony, yet it is not included in subparagraph (vii), while simple robbery, a lesser grade of offense, is included. Rationally, the Legislature could have concluded that because of its inherently violent nature, robbery regardless of degree should be included, while grand larceny, though a greater offense, should not because it is not inherently violent. Moreover, the Legislature could have concluded that since an intentional killing in the course of a grand larceny — a crime not usually associated with violence — is so unlikely, there would be little deterrent effect in making such an offense death-eligible. By contrast, one might expect a more widespread deterrent effect to.result from making intentional killings in the course of violent felonies, such as robbery, subject to the death penalty.
*159 Nor is the statute rendered unconstitutional because, as the defendant argues, "it invites a death sentence for a defendant convicted of murder during a range of felonies, no matter how unplanned or spontaneous, while excluding from capital punishment more serious slayings — such as premeditated murders or killings in which the perpetrator stalks or lies in wait for the victim.” Notwithstanding the defendant’s competing opinion, the Legislature could have rationally determined that it was more important to punish and deter intentional killings in the course of certain violent felonies. The court cannot say that this decision was clearly wrong. (See, Gray v Lucas, 677 F2d 1086, 1104 [5th Cir 1982] [Legislature could rationally decide that problem of felony murders required priority over that of atrocious simple murders, and was more amenable to deterrence].) In narrowing the class of death-eligible murders, the Legislature is not held to a mathematically exacting standard. Only an irrational choice renders the statute unconstitutional. The court concludes that the Legislature’s selection of death eligibility factors easily passes this test. (See, Gray v Lucas, 677 F2d, at 1104 [Legislature’s decision to authorize death penalty for certain types of crimes may not be upset unless clearly wrong].)
Neither is there merit to the defendant’s argument that the use of felonies as aggravating factors renders the statute unconstitutional because, according to defendant, the use of felony murder as an aggravating factor has a disparate racial impact. First, it should be noted that, contrary to the defendant’s claim, as a matter of fact, the Legislature has not included felony murders — killings that occur in the course of certain felonies, regardless of intent to cause death — as death-eligible offenses. Rather, the Legislature has included intentional killings occurring in the course of or in furtherance of certain felonies as offenses worthy of the death penalty. Second, the defendant’s reliance upon dated studies of purported discrimination in the application of the death penalty in other States does not convince this court that New York’s newly enacted death penalty statute, which has yet to lead to a single death verdict, will necessarily be subject to racial prejudice in its application.[7]
There is no evidence before this court that New York’s death penalty statute has been applied, or necessarily will be ap *160 plied, in any way to discriminate against any constitutionally protected class of people. To the extent that the defendant relies upon studies pertaining to the use of the death penalty in other States, even those studies do not conclusively establish that race, or any other impermissible factor, intrudes upon the death penalty decision, which is, after all, based upon myriad factors pertaining to the strength of proof of guilt in the individual case, as well as the aggravating and mitigating factors as applied to the specific defendant. (See, McCleskey v Kemp, 481 US 279 [1987].) Moreover, assuming arguendo the validity of these studies, based as they are upon experiences in other States at other times, they provide no sound basis for concluding prospectively that the New York death penalty will be so unconstitutionally applied.
Count three — Double-counting the victim’s death
Count three of the indictment charges the defendant with an intentional killing in the course of and in furtherance of kidnapping in the first degree. The kidnapping alleged in the indictment constitutes kidnapping in the first degree because the victim allegedly died before he was able to return or be returned to safety. (See, Penal Law § 135.25 [3].)[8] According to the defendant, Penal Law § 125.27 (1) (a) (vii) does not permit a charge of first degree murder premised upon the victim’s dying during the abduction because the intentional killing of the victim cannot also constitute the death in the course of the kidnapping. Furthermore, the Legislature’s intent not to include this type of first degree kidnapping as an aggravating factor is manifest, concludes the defendant, because the only difference between first degree kidnapping as charged in the indictment and second degree kidnapping is the death of the victim during the abduction; thus, "it would be irrational for the legislature to have excluded, within the capital law, intentional murder during a second-degree kidnapping from death-eligibility if it meant to include first-degree kidnappings elevated a degree only by the death of the victim.”
*161 The defendant’s "double-counting” claim is belied by the facts. In this case, no element is double-counted. To establish the third count of the indictment, the People are required to prove two very different things: that the defendant committed an intentional murder in furtherance of kidnapping in the first degree, and that the victim died before he could return or be returned safely. As to the murder element of the crime, the People must prove an intentional killing, while, as to the kidnapping aspect, the People need only prove the victim’s death before his safe return, without regard to the defendant’s intent, or even causation. There is no prohibition, constitutional or otherwise, of using a single circumstance, such as the victim’s death, to establish more than one element of the charged crime. (See, Muniz v State, 851 SW2d 238, 246 [Tex Crim App 1993][9] [conduct which serves as element of murder (causing death) may also serve as element of aggravating factor of aggravated rape (causing serious physical injury, i.e., injury that causes death)].)
Furthermore, ordinary felony murder cases under the former Penal Law, cited by the defendant for the proposition that "the other elements constituting the felony which he [the defendant] is engaged in must be so distinct from that of the homicide as not to be an ingredient of the homicide,” are inapposite for the obvious reason that the defendant is not charged with ordinary felony murder, but with capital murder, which, unlike felony murder, requires proof of an intentional killing. Therefore, the concerns extant in those cases are not present in the instant case.
Nor is there force to the defendant’s claim that "it is not internally logical to charge Mr. Hale with killing to further an offense (first-degree kidnapping) an essential element of which was the victim’s killing — i.e., killing to further a killing.” The plain words of the statute and the indictment belie the defendant’s claim. He is not charged with "killing to further a killing.” Rather, he is charged with an intentional killing in *162 the course of and in furtherance of an abduction in which the victim died.[10]
Second, the defendant’s argument that the Legislature could not have intended to include as an aggravating factor Penal Law § 135.25 (3) kidnappings, while excluding second degree kidnappings, is unpersuasive. The most obvious riposte to the defendant’s argument is that if the Legislature had intended to exclude Penal Law § 135.25 (3) kidnappings from the list of aggravating factors, it could have expressly done so; it did not. Moreover, it is not so far-fetched, as the defendant suggests, that the Legislature decided to include such kidnappings, yet exclude kidnappings in the second degree.
The Legislature could have rationally concluded that intentional killings in the course of kidnappings in which the abductee dies are more worthy of the death penalty than those in which the abductee survives, but a third party is killed incidentally. Moreover, the Legislature could have reasonably concluded that it would be much more likely that a kidnapping victim would be intentionally killed in the course of a kidnapping, rather than some third party intervening in the occurrence, and therefore, deterrence would be better served by making death-eligible only those kidnappings in which the kidnapping victim dies. Therefore, the court rejects the defendant’s invitation to encroach upon legislative prerogatives by holding that the Legislature’s selection of aggravating factors was wholly irrational. (See, Gray v Lucas, 677 F2d, supra, at 1104.)[11]
*163 II. MOTION CHALLENGING METHOD OF ASSIGNING JUDGES
Attacking the method by which Judges are assigned to handle capital cases in Kings County, the defendant claims that a number of his constitutional rights are violated because his case was not assigned to a Judge "based on a system of random judicial assignment.” According to the defendant, he and other capital defendants are being discriminated against because their cases are assigned to a Judge selected randomly from a group of six — characterized by the defendant as "death-qualified” Judges — rather than to any felony Trial Judge. Thus, says the defendant, "[t]o the extent that Mr. Hale has been deprived of the opportunity to have his case heard by one of the many judges who hear noncapital felonies, including murder, he has been deprived of his rights to due process, a fair trial, a reliable sentencing hearing, and equal protection”.
In support of this proposition, the defendant has failed to cite any case on point, but relies instead upon the generalized principle that "death is different”. While this principle no doubt carries weight in some aspects of capital prosecutions, no court has declared that the unique nature of capital cases requires that each and every practice and procedure must be different or more elaborate than that used in an "ordinary” murder case. (Cf., Bass v Estelle, 696 F2d 1154, 1157 [5th Cir 1983].) It is the court’s opinion that the method used to assign Judges to capital cases in Kings County is rational, fair, and consonant with defendants’ rights.
22 NYCRR 200.11 (c) provides, in pertinent part, that an action "shall be assigned to a judge by the clerk of the court in which it is pending pursuant to a method of random selection authorized by the Chief Administrator.” Thus, determination of the method of random selection is left to the Chief Administrator, who may delegate this authority to the Administrative Judge. (See, 22 NYCRR 80.2 [d]; 200.11 [c].) According to a plan instituted by the Chief Administrative Judge and the Administrative Judge for the Second Judicial District, which covers Kings County, six Judges constitute the pool of Judges to which capital cases may be assigned. All of these Judges are also "nonaligned” Judges, i.e., experienced Judges who handle complex criminal cases occurring anywhere within Kings County without regard to their place of origin within the *164 county.[12] Each of these Judges is assigned randomly, on a rotating basis, to sit as the capital case miscellaneous motions Judge for one-month periods, during which time they handle any preindictment motions in potential capital cases. The capital miscellaneous motions Judge retains any potential capital case he or she handles if that case, in fact, becomes a case in which the District Attorney announces that he is seeking the death penalty. Whether a particular Judge within the pool will be assigned to a capital case is dependent upon happenstance: whether he or she receives motions on a case when sitting as the capital miscellaneous motions Judge, and whether the District Attorney subsequently determines to seek the death penalty in that case.[13]
The defendant apparently does not deny that, within the six-Judge pool, cases are assigned randomly. Rather, the defendant claims that it is unconstitutional to limit the pool to six "death-qualified” Judges, rather than to the 40 or so Judges assigned to hear noncapital felony cases. At the outset, it should be noted that the defendant’s allusion to the "death-qualification” of the six pool Judges has no basis in fact. The only criterion by which the six- Judges were chosen was their long experience in handling complex criminal cases. The defendant does not allege, nor is it the case, that any of the six Judges were chosen based upon their views — favorable or unfavorable — toward the death penalty. Nor does the defendant allege that, in fact, any of the six Judges would not judge his case scrupulously.
The Chief Administrative Judge has clear authority to prescribe "the method of random selection” of Judges. His decision to limit the random selection of Judges to those within a pool of six — chosen for their ability to handle the complex issues in interpreting New York’s newly enacted death penalty provisions — is rational, fair, and nondiscriminatory. It is substantially similar to the "nonaligned” system by which other complex criminal cases have been assigned for years. The defendant has failed to allege any prejudice to him, actual *165 or potential, arising from the system.[14] Unsupported by any relevant precedent or authority, the defendant’s claim has no merit whatsoever.[15]
III. MOTION TO STRIKE NOTICE OF INTENT TO SEEK THE DEATH
PENALTY
The defendant moves to strike the District Attorney’s notice of intent to seek the death penalty on the grounds that the recently enacted death penalty legislation, on its face, and as applied to him violates provisions of the United States and New York Constitutions, and Civil Rights Law § 13. Specifically, the defendant claims that the death penalty constitutes cruel and unusual punishment; it violates defendant’s fundamental right to life; and it leads to inevitable racial discrimination.[16] In addition, he claims that the death penalty statute, as applied, violates protections against racial discrimination.
The “Cruel and Unusual Punishments” Claim
In Gregg v Georgia (428 US 153 [1976], supra) the United States Supreme Court determined that the death penalty does not constitute cruel and unusual punishment, per se, under the Eighth Amendment to the United States Constitution. *166 Furthermore, in Gregg, the Court found that Georgia’s capital scheme — which provides that only a narrow class of murderers may be subject to the death penalty; that, as a prerequisite to a death sentence, the jury must find that a statutory aggravating factor has been established beyond a reasonable doubt; that the jury may consider all factors mitigating against a death sentence; and that a judgment resulting in a death sentence may be appealed directly to the State’s highest court, where it will be reviewed for errors of law and to determine whether the death sentence was imposed as a result of passion or prejudice, and whether the sentence in the particular case is disproportionate to those sentences imposed in similar cases — passes constitutional muster. (Supra, at 196-207.) New York’s legislation provides for all of these protections and more.[17] Therefore, this court concludes that New York’s capital statute does not violate the prohibition against cruel and unusual punishment under the United States Constitution. (See, Gregg v Georgia, 428 US 153; see also, People v Chinn, NYLJ, Nov. 19, 1996, at 31, col 3 [Onondaga County Ct 1996].)
This conclusion does not end the court’s inquiry, however, since the Court of Appeals has "frequently applied the State Constitution, in both civil and criminal matters, to define a broader scope of protection than that accorded by the Federal Constitution in cases concerning individual rights and liberties”. (See, People v P. J. Video, 68 NY2d 296, 303 [1986] [citations omitted].) As a consequence, the court must undertake a separate analysis of the constitutionality of the statute under article I, § 5 of the New York Constitution, which parallels the Eighth Amendment.
In reviewing the constitutionality of the law, the court is mindful that legislative enactments enjoy a strong presumption of constitutionality and should be stricken "only as a last resort”. (People v Davis, 43 NY2d 17, 30 [1977]; see also, McKinney’s Cons Laws of NY, Book 1, Statutes § 150.) "Every act of the legislature must be presumed to be in harmony with the fundamental law until the contrary is clearly made to appear.” (People ex rel. Kemmler v Durston, 119 NY 569, 577 [1890] [citations omitted].) "[C]ourts may not substitute their judg *167 ment for that of the Legislature as to the wisdom and expediency of the legislation.” (People v Davis, 43 NY2d, at 30.) Courts of first instance must take special caution in exercising the sweeping power to strike a statute as unconstitutional. (See, McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [a].) The party challenging the provision must prove beyond a reasonable doubt that the statute violates a constitutional requirement. (See, Fenster v Leary, 20 NY2d 309 [1967].)
First, the court must undertake an interpretive analysis of the constitutional provision in question, focusing on whether the text of the State Constitution specifically recognizes rights not enumerated in the Federal Constitution. (See, People v P. J. Video, 68 NY2d, supra, at 302.) Specifically, does the language of article I, § 5 support a broader interpretation of the individual right than that of the Eighth Amendment?
Article I, § 5 of the New York Constitution provides that, "Excessive bail shall not be required nor excessive fines imposed, nor shall cruel and unusual punishments be inflicted, nor shall witnesses be unreasonably detained.” Insofar as the Cruel and Unusual Punishments Clause is concerned, it mirrors the Eighth Amendment of the United States Constitution, "and in this form it first appears in the Constitution of this state adopted in 1846.” (People ex rel. Kemmler v Durston, 119 NY 569, 576 [1890], supra.) Because the relevant text of article I, § 5 is the same as that of the Eighth Amendment, and arose from the same historical context,[18] interpretive analysis leads to the conclusion that the text of article I, § 5 provides no basis for interpreting New York’s prohibition against cruel and unusual punishment any differently from that of the Eighth Amendment.
Second, the court must apply a "noninterpretive” analysis, which "proceeds from a judicial perception of sound policy, justice and fundamental fairness”. (People v P. J. Video, 68 NY2d, supra, at 303.) "A noninterpretive analysis attempts to discover, for example, any preexisting State statutory or common law defining the scope of the individual right in question; the history and traditions of the State in its protection of the individual right; any identification of the right in the State *168 Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right.” (Supra.)
Advancing his claim that the death penalty must be struck down under a noninterpretive analysis of the New York Constitution, the defendant asserts that "[w]hether the death penalty constitutes cruel and unusual punishment in violation of Article I, § 5 is a threshold issue of first impression.” However, it appears that the Court of Appeals has addressed this issue on at least one occasion, if tangentially. In People ex rel. Kemmler v Durston (119 NY 569 [1890], supra) the Court held that the Legislature’s amendment of the Penal Law to change the method of imposing the death penalty from hanging to electrocution did not contravene New York’s prohibition against cruel and unusual punishments. (Supra, at 576-578.) Although the Court of Appeals did not squarely address the issue of whether the death penalty, per se, is violative of article I, § 5, that the Court determined that a particular method of capital punishment was permissible lends support to the conclusion that the Court must have found, incidentally, that the death penalty, itself, was not violative of the Constitution.
In so holding, the Court stated that, "[t]he infliction of the death penalty in any manner must necessarily be accompanied with what might be considered in this age, some degree of cruelty, and it is resorted to only because it is deemed necessary for the protection of society.” (People ex rel. Kemmler v Durston, 119 NY, supra, at 577.) In a related appeal, the Court, in dicta, added that, "[p]unishment by death, in a general sense, is cruel; but, as it is authorized and justified by a law, adopted by the people as a means to the end of the better security of society, it is not cruel within the sense and meaning of the Constitution.” (People v Kemmler, 119 NY 580, 586 [1890].) In any event, because interpretation of the Cruel and Unusual Punishments Clause " 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society’ ” (Gregg v Georgia, 428 US 153, 173 [1976], supra, quoting Trop v Dulles, 356 US 86, 101 [1958]), this court must consider whether the death penalty constitutes cruel and unusual punishment in the context of contemporary values, and not those of over 100 years ago.
Applying noninterpretive analysis informed by New York’s contemporary values, the court finds that none of the defendant’s assertions bear scrutiny.
The defendant’s claim that the death penalty has dwindled in its availability and use in New York does not ac *169 curately reflect the historical and persistent acceptance of the death penalty in this State. In fact, notwithstanding continuing calls for its abolition from some quarters, capital punishment has had an enduring vitality in New York from colonial days to the present.
In colonial New York, the death penalty applied to a wide array of offenses. In his Practice Commentary, Judge Donnino notes that:
"Significant curtailment of the appalling list of capital offenses appears to have commenced in 1788 when they were restricted to murder, treason, rape, buggery, burglary, larceny from a church, arson, mayhem, and certain kinds of forgery and counterfeiting. In 1796, the list was sharply reduced to two; murder and treason; and, in 1813, burning of an inhabited dwelling, later known as arson in the first degree, was added.
"During the next fifty years, the list of capital crimes remained small and fairly constant.” (Donnino, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 125.27, 1997 Pocket Part, at 337.)
The statute remained largely unchanged until 1965-1966, when the death sentence was limited to the killing of a police officer in the course of his/her duties, or a killing committed by a person serving a term of imprisonment, the minimum of which was 15 years and the maximum of which was life.
In recent history, New York was without the death penalty only for relatively brief periods. In 1973, the statute was struck down by the Court of Appeals as violative of the principles set down by Furman v Georgia (408 US 238 [1972]; see, People v Fitzpatrick, 32 NY2d 499 [1973]). In reaction to Furman, the Legislature passed a mandatory death penalty statute, which was struck down in 1977 in People v Davis (43 NY2d 17 [1977], supra) on Federal constitutional grounds. After Davis, the New York Legislature, like the majority of State Legislatures, passed revamped capital statutes to comply with Federal constitutional mandates. Repeated gubernatorial vetoes kept the death penalty from becoming law until 1995, with the passage of the present statute.
Thus, a review of New York’s history establishes that the death penalty has been a facet of this State’s jurisprudence for the overwhelming majority of its history. Neither the Legislature nor the people have rejected the death penalty per se at any point in the State’s history. Only for relatively brief periods, primarily as a consequence of judicial intervention, *170 was New York without a death penalty. Of course, the most compelling evidence of the death penalty’s acceptance in New York today is the reestablishment of the death sentence in 1995, making New York one of 38 States, along with the Federal Government, to sanction the punishment.
That juries, historically, have seen fit to impose the death penalty in a small number of cases does not lead to the conclusion that the very existence of capital punishment does not comport with the standards of society. As the Supreme Court has commented: "It may be true that evolving standards have influenced juries in recent decades to be more discriminating in imposing the sentence of death. But the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment per se. Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases.” (Gregg v Georgia, 428 US, supra, at 181-182, citing Furman v Georgia, 408 US, supra, at 388 [Burger, Ch. J., dissenting].)
Moreover, it is of little consequence that the latest death penalty scheme includes more death-eligible crimes than the prior statutes. The defendant quotes Justice Brennan for the proposition that, "[t]ime works changes, brings into existence new conditions and purposes. Therefore, a principle to be vital must be capable of wider application than the mischief which gave it birth.” (Furman v Georgia, 408 US 238, 264 [1972] [Brennan, J., concurring], supra, quoting Weems v United States, 217 US 349, 373 [1910].) This maxim does not lead inexorably to the conclusion urged by the defendant: that punishments must necessarily become more lenient with the passage of time. Rather, the Legislature could have reasonably concluded that the ills of today’s society require a more expansive death penalty statute than those which gave rise to the capital statutes of decades past.
The defendant also argues that the special concern for the rights of capital defendants expressed in several other constitutional provisions manifests New York’s special concern in this area, and consequently, the court should find the death penalty to be cruel and unusual punishment under a noninterpretive analysis. To the contrary, the provisions cited by the defendant — article I, § 2 (prohibiting waiver of jury trial in capital cases); article VI, § 3 (a) (limiting jurisdiction of Court of Appeals to review questions of law, except where judgment is death); and article VI, § 3 (b) (providing for direct appeal to *171 Court of Appeals where judgment is death) — convince the court that the framework of the New York Constitution presupposes the availability and permissibility of the death penalty, for there would be no reason for the existence of these provisions were it otherwise.
Nor does the court accept the defendant’s contentions that the administration of the death penalty will inevitably result in invidious discrimination against certain racial groups, or any other constitutionally cognizable class of persons, or that "there is a serious risk that innocent defendants will be executed.” The discretion to seek and impose the death penalty is carefully circumscribed by the statute. The District Attorney may seek the death penalty only if the charged crime falls within a narrow subclass of aggravated murders. Only if the District Attorney proves beyond a reasonable doubt all of the elements of the crime, including the statutory aggravating factor or factors, may the jury consider whether to impose a death sentence.
In making the sentencing determination, the jury’s discretion is also carefully guided by statutory mandates. The jury must weigh any and all mitigating evidence against the established aggravating factor or factors. Even if the jury is convinced that the aggravating factors outweigh the mitigating evidence, it still may exercise its mercy function and decline to impose death. Should the jury return a death sentence, that determination is reviewed directly by the Court of Appeals, which may overturn the sentence if it finds that it was obtained in violation of the law, or was contrary to the evidence, or was the result of passion or prejudice, or is disproportionate under the circumstances.
"The ultimate issue is whether society through its Legislature or lawmaking body may determine the usefulness of capital punishment or whether Judges are empowered to do so, recognizing that capital punishment has been a sanction throughout the history of Anglo-American law.” (People v Davis, 43 NY2d 17, 46 [1977] [Breitel, Ch. J., dissenting], supra.) In moving to strike the death notice, what the defendant seeks is a judicial declaration that the Legislature should not be permitted to enact the death penalty under any circumstances, for if New York’s present legislation, with its myriad protections and safeguards, cannot pass constitutional muster, it is hard to imagine that any attempt to establish capital punishment in this State could clear the high constitutional hurdle set by such a decision.
*172 Only two State courts — California and. Massachusetts — have ever intruded so far into legislative prerogatives as to determine that capital punishment is never permissible. (See, People v Anderson, 6 Cal 3d 628, 493 P2d 880 [1972]; District Attorney for Suffolk Dist. v Watson, 381 Mass 648, 411 NE2d 1274 [1980].) In the wake of these rare judicial interventions, both States passed constitutional amendments reaffirming the long-standing principle that, for the most heinous murders, a sentence of death may be appropriate. " '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.’ ” (Gregg v Georgia, 428 US, supra, at 175, quoting Furman v Georgia, 408 US 238, 383 [1972] [Burger, Ch. J., dissenting], supra.) Giving due deference to the Legislature’s determination that capital punishment is an appropriate response to the aggravated murders enumerated in Penal Law § 125.27, this court cannot say that the lawmakers were "clearly wrong”. (Gregg v Georgia, 428 US, at 187-188.)
Moreover, there is no support for the defendant’s assertion that the Legislature enacted the death penalty statute with knowledge that its use results in patent racial discrimination. The defendant’s claim rests upon the oft-cited, yet unproven, allegation that the imposition of the death penalty falls disproportionately upon certain groups because of racial discrimination in the process. The Legislature ensured that New York’s capital statute does not permit a jury unfettered discretion to issue the death penalty; sentencing discretion is guided by particularized, racially neutral criteria. In addition, the Court of Appeals is empowered to review a death verdict for any claim of racial bias. Thus, it should be apparent that the Legislature did not enact the death penalty hoping to discriminate against some suspect class, but passed the statute as a consequence of its perception of the ills of society, and in so doing, made every reasonable effort to provide that invidious discrimination would play no part in the process.
It cannot be overemphasized that New York’s death penalty statute is a far cry from the capital punishment scheme condemned in Furman v Georgia (supra). By contrast, New York’s legislation carefully limits the discretion to seek the penalty, and provides prudent direction for the jury’s determination of punishment. Jurors may sit in judgment of the case only after they have been individually questioned by the parties concerning their attitudes about race and prejudice. As a hedge against the possibility of an illegitimate death verdict, *173 the Court of Appeals is empowered to set aside any improvidently issued capital punishments. Such a scheme ensures that the consideration of the sentence is guided by uniform standards, and that any death verdict will be based upon the merits of the individual case, and not upon passion, prejudice, or bigotry.
For the same reasons, the court rejects the defendant’s claim that the use of the death penalty will result inevitably in the execution of the wrongly accused. As the defendant has noted repeatedly in his motion papers, our State proudly leads the Nation in providing far-reaching protections for individual rights, including the rights of criminal defendants. In addition to the extraordinary protections accorded defendants in capital cases, New York law provides for additional protections, e.g., requiring corroboration of accomplice testimony, that greatly reduce the likelihood of an erroneous conviction. Coupled with direct review of death sentences by the Court of Appeals, these unique protections ensure to the greatest degree possible that any death verdict will rest upon a solid foundation.
It is notable that almost three fourths of the States enacted new death penalty legislation in reaction to Furman v Georgia (supra), and the vast majority of those death penalty schemes— many of which do not provide as many protections for the defendant as New York’s — have withstood Federal and State constitutional scrutiny. As mentioned above, only in California and Massachusetts did the revised statutes meet with disapproval on the State constitutional level; as a consequence, both States passed constitutional amendments declaring that death shall not be considered to be cruel and unusual punishment.
"Whatever one thinks of capital punishment, the Legislature is entitled to conclude, rightly or wrongly, that the death penalty serves useful social purposes.” (People v Davis, 43 NY2d 17, 46 [1977] [Breitel, Ch. J., dissenting], supra.) In the face of such overwhelming evidence of the acceptance of the death penalty in the United States generally and New York particularly, there is no basis for the court to conclude that capital punishment is contrary to the values of contemporary New York society.
Among the useful social purposes which the Legislature might conclude are advanced by the death penalty is deterrence of crime, notwithstanding the conflicting evidence on this point. (See, Gregg v Georgia, 428 US, supra, at 186-187.) The defendant makes much of the many studies which purport to show that there is no deterrent effect from capital punish *174 ment, and attacks as fatally flawed those studies which support an inference that deterrence results from the death penalty. Where there is a dispute as to the desirability and feasibility of a policy, it is not for this court to choose sides and resolve the policy debate. "[C]ourts may not substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation.” (People v Davis, 43 NY2d, supra, at 30.) The court cannot say that the Legislature was plainly wrong to credit those studies that find a deterrent effect, and reject those that do not.
So, too, the Legislature may have found that the death penalty served a proper retributive purpose. The defendant is incorrect in asserting that the value of retribution may not be advanced by penal sanctions. Although retribution is not a valid penological goal standing alone, it may, along with deterrence, constitute one of the ends of the Penal Law. (See, People v Notey, 72 AD2d 279, 282 [2d Dept 1980] [four objectives of criminal punishment are deterrence, rehabilitation, retribution, and isolation]; see also, Gregg v Georgia, 428 US, supra, at 183 [retribution is not forbidden objective of law nor one inconsistent with respect for dignity of man].)
In addition to his argument that capital punishment is cruel and unusual because it contravenes New York’s contemporary standards of decency, the defendant also claims that the death penalty must be struck down because it is a punishment disproportionate to the offense of aggravated intentional murder, as defined in Penal Law § 125.27. "Rarely has a penal sanction been struck down by the courts of this State as unconstitutional under the cruel and unusual punishments clause, and never on the ground of disproportionality”. (People v Broadie, 37 NY2d 100, 117 [1975].) "We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.” (Gregg v Georgia, 428 US, supra, at 175.)
"[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community’s belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.” (Gregg v Georgia, 428 US, supra, at 184.) The court is not aware of any Federal or New York precedent holding that the death penalty is a disproportionate punishment for the commission of the types of aggravated *175 murders prescribed by Penal Law § 125.27. There is nothing in the text of the New York Constitution or the history and practices of this State that leads the court to conclude that the punishment of death is so grossly disproportionate to the crimes enumerated in Penal Law § 125.27 as to render the statute unconstitutional.
The "Fundamental Right to. Life” Claim
The defendant asserts that the imposition of the death penalty against a criminal defendant who has been convicted of committing an aggravated, intentional murder violates the fundamental right to life under the New York Constitution. It is enough to say that there is no support in the Federal or State Constitution, or any other source of Anglo-American law, for the claim that the convicted perpetrator of a particularly atrocious murder enjoys an unqualified right to life, notwithstanding the Legislature’s rational determination that the only appropriate sanction for the defendant’s egregious conduct is death. (See, Gregg v Georgia, 428 US, supra, at 184; see also, Gray v Lucas, 677 F2d 1086, 1104 [5th Cir 1982], supra [legislative classifications that may result in the death penalty do not require a higher level of scrutiny than rational basis].)
Equal Protection
In support of his argument that the death penalty, as applied, violates, inter alia, New York’s prohibitions against racial discrimination, the defendant compares his case to that of other accused, death-eligible murderers throughout the State, and reaches the conclusion that, "the Kings County District Attorney and New York’s other district attorneys take the race of the defendant and of the victim into account when deciding to seek the death penalty.” (Defendant’s motion to strike the death notice, at 99.) He claims that in his case, the District Attorney has chosen to seek the death penalty in an attempt to curry favor with certain groups. As further evidence of racial animus, he points to a form used by the District Attorneys to record the race of death-eligible defendants.
"[A] defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination.’ ” (McCleskey v Kemp, 481 US 279, 292, supra, quoting Whitus v Georgia, 385 US 545, 550 [1967].) To prevail under the Equal Protection Clause, the defendant must prove that the decision makers in his case acted with a discriminatory purpose. (Supra.) Apart from conclusory and unsubstanti *176 ated hearsay allegations that the District Attorney is seeking the death penalty in this case for political purposes, the defendant has failed to allege any specific facts that would support an inference of discrimination in his case. More specifically, there can be no inference of invidious discrimination arising from the District Attorneys’ practice of accounting for the race of death-eligible defendants. There is no reason to doubt that the prosecutors are compiling this information for the purpose of complying with the mandate that the death penalty be administered without regard to impermissible factors such as race, as well to record information that may be used in response to challenges to the application of the death penalty.
The defendant also relies upon statistics to establish racial animus in the application of the death penalty. Of course, since no defendant has yet been convicted of a capital crime under the new statute, it is impossible to say that the death penalty will be unfairly administered in New York. Nevertheless, the defendant, relying upon a statistical analysis of which death penalty eligible defendants were actually charged with murder in the first degree, asks the court to speculate that decisions to seek the death penalty have been influenced by prejudice, and that that prejudice has infected the entire death penalty scheme.
It is interesting to note that in one portion of the defendant’s motion, he cites studies which purport to show that the death penalty has always been used disproportionately against African-American defendants, yet, the defendant claims here that the death penalty, as applied to him, is being used to discriminate against him because he is white. In addition, he asserts that, since the new death penalty statute was passed and through December 31, 1996, whites have committed only about 18% of death-eligible murders, yet 60% of all defendants against whom a notice of intent to seek the death penalty has been filed are white. This apparent paradox is indicative of the folly of relying upon statistics alone to establish that the death penalty is being applied in a racially discriminatory fashion.
Many factors influence the decision to seek the death penalty and the decision to impose it: the strength of the proof of the crime, including what evidence may or may not be admissible at trial; the grievousness of the facts making the killing an aggravated murder; the number of aggravating factors that may be proven; and the amount and quality of any mitigating evidence, including the character of the particular defendant. These factors are capable of incalculable permutations and *177 combinations from case to case. As the United States Supreme Court found in McCleskey v Kemp, "[w]here the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.” (McCleskey v Kemp, 481 US, supra, at 313.) Likewise, this court cannot say that the District Attorneys’ charging decisions, based as they are upon numerous permissible factors, are influenced in whole or in part by any impermissible factor, such as race.
Nor may it be said that the discretion left to the District Attorney violates any constitutional prerogatives. It is well established that the prosecutor may be entrusted with charging decisions (see, McCleskey v Kemp, 481 US, supra, at 296; People v Valles, 62 NY2d 36, 39 [1984]), and the exercise of that discretion in the context of capital cases, unless proved to be for an invidious purpose, is not unconstitutional. (See, Gregg v Georgia, 428 US, supra, at 199; see also, Cantu v State, 842 SW2d 667, 692 [Tex Crim App 1992].)
Therefore, and for the foregoing reasons, the motion to strike the notice of intent to seek the death penalty is denied.
IV. MOTION CHALLENGING GUILTY PLEA AND "NO BENCH TRIAL,” PROVISIONS OF THE CRIMINAL PROCEDURE LAW
The defendant claims that provisions of the Criminal Procedure Law which prohibit him from pleading guilty without the consent of the District Attorney and the permission of the court, and prohibit him from waiving his right to a jury trial, violate various New York and Federal constitutional provisions. In opposition, the People argue not only that the contested statutes comply with constitutional mandates, but that the defendant does not have standing to raise a challenge to the statutory limits on guilty pleas in capital cases, since there is nothing in the record to suggest that the defendant has offered to enter a plea of guilty.[19]
Standing
The People assert that the defendant cannot challenge the provisions regulating guilty pleas in capital cases because he has not offered to plead guilty, and therefore has not suffered any injury in fact. In the court’s opinion, this argument is untenable. As discussed in detail below, the defendant does not assert merely that he has been denied the right to plead *178 guilty, but that the plea provisions effectively penalize his right to a jury trial. Assuming arguendo that the plea provisions are defective, the defendant is, in fact, harmed, because his right to a jury trial is impaired by plea provisions that penalize that right. Therefore, even if the defendant were to abjure a plea and exercise his right to a jury trial, he would have standing to raise this claim. (See, Robtoy v Kincheloe, 871 F2d 1478, 1480 [9th Cir 1989].)
CPL 220.10 (5) (e), 220.30 (3) (b) (vii), and 220.60 (2) (a)
CPL 220.10 (5) (e), 220.30 (3) (b) (vii), and 220.60 (2) (a) permit a defendant charged with murder in the first degree to plead guilty only when the sentence to be imposed pursuant to the plea is one authorized for murder in the first degree, other than death.[20] In addition, the plea must be with the permission of the court and the consent of the People. (See, CPL 220.10 [5] [e]; 220.30 [3] [b] [vii]; 220.60 [2] [a].)
In United States v Jackson (390 US 570 [1968]), the Supreme Court of the United States struck down the death penalty provision of the Federal Kidnaping Act (commonly known as the Lindbergh Law) which provided, in pertinent part, that: " 'Whoever knowingly transports in interstate * * * commerce, any person who has been unlawfully * * * kidnaped * * * and held for ransom * * * or otherwise * * * shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.’ ” (United States v Jackson, 390 US, supra, at 570-571, quoting 18 USC § 1201 [former (a)].) The Court interpreted the Act to authorize the imposition of the death penalty only after a jury trial, but not following conviction upon a guilty plea or a nonjury trial. (United States v Jackson, 390 US, at 571.)
Concluding that the Act’s death penalty provision was unconstitutional, the Court remarked that "the defendant’s assertion of the right to [a] jury trial may cost him his life, for the federal statute authorizes the jury — and only the jury — to return a verdict of death.” (See, United States v Jackson, 390 US 570, 572, supra.) The Court held that the statute was unconstitutional because it "needlessly penalize[d] the assertion *179 of a constitutional right.” (Supra, at 583, citing Griffin v California, 380 US 609.) According to the Court, the statute needlessly encouraged guilty pleas and effectively penalized the right to a jury trial by exposing the defendant to the risk of death only when he exercised his constitutional rights.
The evil of the Act was that it "tend[ed] to discourage defendants from insisting upon their innocence and demanding trial by jury”. (United States v Jackson, 390 US, supra, at 583.) ”[T]he defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die.” (United States v Jackson, 390 US, at 581.)[21]
It is apparent that New York’s death penalty statute, likewise, provides for the imposition of the death penalty only upon recommendation of the jury; the provisions governing pleas in capital cases in New York expressly forbid the imposition of the death penalty upon a plea of guilty (see, CPL 220.10 [5] [e]; 220.30 [3] [b] [vii]; 220.60 [2] [a]), and a defendant may not waive a jury trial where the crime charged may be punishable by death. (See, NY Const, art I, § 2.)[22] Only if the defendant insists upon exercising his Sixth Amendment right to a *180 jury trial and his Fifth Amendment privilege against self-incrimination does he risk death. Therefore, unless New York’s law may be distinguished from the Act in question in Jackson (supra), this court is bound to find the plea provisions to be unconstitutional. (See, People v Black, 34 AD2d 999, affd without opn 30 NY2d 593 [1972] [in obiter dicta, citing Jackson, Appellate Division stated that where the death sentence may be imposed, when appropriate, only upon a jury verdict of guilty (Penal Law former § 125.30), under such statutory scheme death penalty is unconstitutional since it needlessly encourages taking of guilty pleas]; compare, Lyons v Howard, 434 F2d 632, 633 [6th Cir 1970] [finding Kentucky’s death penalty statute distinguishable from that in Jackson because capital defendant in Kentucky subjects himself to death penalty whether he is tried before a jury, to the court, or pleads guilty].)
The People point out that, by contrast with the Federal law in question in Jackson (supra), New York’s statute, along with the New York Constitution, does not permit death-eligible defendants to waive the right to a jury trial. (See, NY Const, art I, § 2; CPL 320.10 [1].) Thus, the People argue, because New York does not permit death-eligible defendants to waive their right to a jury trial, capital defendants are not needlessly encouraged to abandon that right; indeed, it is impossible for them to do so.
Not only are the People wrong in asserting that New York’s statute does not require defendants, at least incidentally, to waive their right to a jury trial to avoid the risk of death (see, People v Lee, 58 NY2d 491, 494 [1983] [guilty plea waives, inter alia, right to jury trial]), but New York’s scheme actually results in greater prejudice to the defendant than that in Jackson (supra). Under the Federal Kidnaping Act, a defendant could avoid the risk of death in two ways: he could either plead guilty, thereby relinquishing his Sixth Amendment right to a jury trial and his Fifth Amendment privilege against self-incrimination, or he could request a bench trial, thereby waiving only his right to a trial by jury. (See, United States v Jackson, 390 US, supra, at 571.) By contrast, under New York law, a defendant may avoid the risk of death only by pleading guilty, waiving both rights: his right to a jury trial; and his privilege against self-incrimination, as well.
*181 In any event, Jackson makes clear that two rights are violated by death penalty schemes which provide for the imposition of death only after a jury trial: the Sixth Amendment right to a jury trial; and the Fifth Amendment right not to plead guilty. (United States v Jackson, 390 US, supra, at 581, citing Herman v Claudy, 350 US 116.) Therefore, even assuming that the statute’s fault did not implicate the right to a jury trial, it would still infringe upon the defendant’s Fifth Amendment rights.
Next, the People argue that Jackson (supra) is distinguishable because, under the New York law, "an open plea of guilty is not possible”. According to the People, because the defendant must secure the permission of the court and the consent of the People before entering a guilty plea, "a defendant cannot heedlessly tender a plea of guilty to the entire indictment.” However, in Jackson, the defendant did not have the unbridled right to enter a guilty plea, either.
Justice White, in a dissent joined by Justice Black, argued that any defect in the Federal Kidnaping Act could be addressed by "making it clear that pleas of guilty and waivers of jury trial should be carefully examined before they are accepted, in order to make sure that they have been neither coerced nor encouraged by the death penalty power in the jury.” (United States v Jackson, 390 US, supra, at 592 [White, J., dissenting].) Rejecting the dissent’s solution, the Court noted that, "[t]he power to reject coerced guilty pleas and involuntary jury waivers might alleviate, but it cannot totally eliminate, the constitutional infirmity in the capital punishment provision”. (United States v Jackson, 390 US, at 583.) The Court made it clear that it was the needless encouragement of guilty pleas together with the penalty imposed upon defendants who exercised their right to a jury trial which rendered the statute infirm.
While it is true that in Jackson (supra), the consent of the prosecutor was not required to enter a guilty plea, this is a distinction without a difference. (Cf., Spillers v State, 84 Nev 23, 436 P2d 18, 21-23 [1968] [striking down death penalty statute that provided for imposition of death only after jury trial, and permitted defendant to waive jury with permission of court and consent of prosecutor].) If, as the Jackson Court proclaimed, judicial scrutiny of pleas is no remedy for the constitutional infirmity, the problem is not relieved by requiring the further consent of the prosecutor, who, after all, as the defendant’s adversary, cannot be said to have the defendant’s best interests *182 first and foremost in mind. It is to the prosecutor’s advantage to use the threat of death upon a conviction by jury to induce defendants to accept guilty pleas to avoid that risk. Indeed, one might argue that the prosecutor is most likely to consent to guilty pleas not in cases where guilt is certain and the likelihood of a death verdict is high, but in cases where proof of guilt is wanting. It is in those cases that one is most likely to find the "defendant ingenuous enough to seek a jury acquittal” (United States v Jackson, 390 US, at 581), but who is chilled in exercising his rights by the threat of death upon a jury verdict.
Nor can one argue that New York’s plea provisions are sustainable because they codify permissible plea bargaining. It is true, in principle, that a capital defendant may bargain to plead guilty to a crime that is not punishable by death, thereby avoiding the risk of capital punishment. (See, Brady v United States, 397 US 742 [1970].) What is forbidden is a scheme, like New York’s, in which the possibility of death only arises from the defendant’s exercise of his right to a jury trial. (Cf., Corbitt v New Jersey, 439 US 212, 226 [1978] [Stewart, J., concurring in the judgment] [unlike Act at issue in Jackson (supra), New Jersey statute did not provide for death, and convicted defendant could be sentenced to maximum penalty of life imprisonment whether he pleads guilty or goes to trial].)
To avoid this problem, the overwhelming majority of death penalty jurisdictions, including the Federal system, provide that if a defendant pleads guilty to capital murder, his sentence is to be determined in a penalty proceeding after which death or a term of imprisonment may be imposed. (See, e.g., Fla Stat Annot, tit XLVII, § 921.141; 720 111 Comp Stat Annot 5/9-1; Ohio Rules Crim Pro, rule 11 (C) (3); 42 Pa Cons Stat Annot § 9711; 18 USC § 3593 [b].) In Arkansas, defendants are not permitted to waive a jury trial unless the State first revokes its intent to seek the death penalty, and thus the Jackson problem is avoided. (See, Ark Rules Crim Pro rule 31.4; Ark Stat Annot § 41-1302 [1], now Ark Code Annot § 5-4-603; see also, Ruiz v State, 275 Ark 410, 630 SW2d 44, 47 [1982].) The court has surveyed the laws of every other death penalty State, and it appears that no other jurisdiction permits guilty pleas to capital murder, yet provides for the imposition of death only, after the defendant contests his guilt before a jury, as New York does. By removing the disparity in potential punishment between defendants who request a jury trial and those who plead guilty, other States have addressed the concerns of Jackson (supra). No doubt, these States enacted those provi *183 sions for that very purpose, and in some instances, in response to opinions of their highest courts striking down death penalty provisions pursuant to Jackson. (See, State v Johnson, 134 NH 570, 595 A2d 498 [1991]; Commonwealth v Colon-Cruz, 393 Mass 150, 470 NE2d 116 [1984];[23] State v Frampton, 95 Wash 2d 469, 627 P2d 922 [1981]; State v Funicello, 60 NJ 60, 286 A2d 55 [1972]; Spillers v State, 84 Nev 23, 436 P2d 18 [1968], supra.)
Indeed, the Supreme Court created a road map for States to follow in complying with the mandate of Jackson (supra). The Jackson Court noted that, "[i]n some States, for example, the choice between life imprisonment and capital punishment is left to a jury in every case — regardless of how the defendant’s guilt has been determined.” (United States v Jackson, 390 US, at 582 [emphasis in original].) The Court concluded that "[g]iven the availability of this and other alternatives, it is clear that the selective death penalty provision of the Federal Kidnaping Act cannot be justified”. (United States v Jackson, 390 US, at 582-583.) It does not suffice to claim that, because the intention of the Legislature may have been to mitigate the severity of the death penalty by permitting nondeath pleas to capital crimes, the statute passes constitutional muster. As the Supreme Court held in Jackson, "[w]hatever might be said of Congress’ objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights.” (United States v Jackson, 390 US, at 582.)
While New York courts in the past have not had occasion to apply Jackson (supra) to a death penalty statute,[24] its import has not been lost on the Court of Appeals. In People v Michael A. C. (27 NY2d 79, 86 [1970]), the Court of Appeals struck down the provision of the former Code of Criminal Procedure which allowed for youthful offender treatment for certain defendants only if they waived their right to a jury trial. (See, People v Michael A. C., 27 NY2d, at 86.) The Court held that "although any defendant, including a youthful offender, is free to consent to a trial without a jury if, in fact and reality, he prefers to be so tried — and knowingly waives his constitutional right — this *184 does not mean that a State may demand that such a consent be given as an absolute precondition to affording him the benefits of youthful offender treatment.” (People v Michael A. C., 27 NY2d, at 86, citing United States v Jackson; Nieves v United States, 280 F Supp 994.) It noted that, "[t]he defendant in the case before us would not, it is true, have been subject to the death penalty had he refused to consent to a nonjury trial but he certainly would have been exposed to a considerably longer period of imprisonment than he could receive if prosecuted as a youthful offender.” (People v Michael A. C., 27 NY2d, 79, 86 [1970].) "[A] procedure which offers an individual a reward for waiving a fundamental constitutional right, or imposes a harsher penalty for asserting it, may not be sustained.” (People v Michael A. C., 27 NY2d, at 86.)
Needless to say, if it infringes upon a noncapital defendant’s rights to condition youthful offender treatment upon jury waiver, a fortiori, it is impermissible, in a case involving capital punishment, which is "unique in its severity and irrevocability” (Gregg v Georgia, 428 US 153, 187, supra), to do the same. (Cf., Corbitt v New Jersey, 439 US, supra, at 217 [distinguishing Jackson (supra) by finding that pressures to forego trial and plead guilty are different in capital case because of unique quality of capital punishment].)
Lastly, the People attempt to distinguish Jackson (supra) by claiming that "the federal statute operated as a mandatory death penalty scheme.” It is difficult to understand how this alleged distinction leads to different result. Insofar as the holding of Jackson is concerned, it is of no consequence that one statute mandated death upon conviction, while the other allows the possibility of the imposition of death in the jury’s discretion after a separate penalty phase. Both statutes share the same defect: penalizing defendants by subjecting them to the risk of death only upon their exercise of the right to jury trial.
In any event, the People’s reading of the Federal Kidnaping Act is plainly wrong. The Act provided for a sentence of death "if * * * the jury shall so recommend” (emphasis supplied), or "imprisonment for any term of years or for life, if the death penalty is not imposed.” (18 USC § 1201 [former (a)].) In the face of this plain language, the People’s claim that the Act mandated death upon conviction strains credulity, to say the least.
In sum, all attempts by the People to distinguish New York’s statute from the death penalty provision at issue in Jackson (supra) fall short.
*185 "Courts of first instance should not exercise transcendent power of declaring an act of the Legislature unconstitutional except in rare cases involving life and liberty, and where the invalidity of the act is apparent on its face.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [a], at 312-313.) This is such an instance. Plainly, life and liberty are at stake in this case. Moreover, as much as the court may wish to effect the intent of the Legislature and harmonize the plea provisions with constitutional requirements, the court does not fulfill its obligations by turning a blind eye to the compelling evidence of their unconstitutionality. "In the field of federal constitutional law, the decisions of the United States Supreme Court are of course binding upon all state courts.” (State v Forcella, 52 NJ 263, 294, 245 A2d 181, 198 [1968] [Jacobs and Hall, JJ., dissenting].) "Our clear responsibility is to apply those decisions with due regard for their tenor, principles and goals in analogous situations with the aim of determining a matter as we conscientiously believe that Court would if the case were before it.” (Supra, 52 NJ, at 294-295, 245 A2d, at 198.) "No Judge must ever hesitate to act when a statute’s constitutional invalidity is apparent beyond a reasonable doubt.” (People v Velez, 88 Misc 2d 378, 395 [NY County 1976] [striking down mandatory death penalty statute].)
In the face of overwhelming evidence — the Jackson decision (supra) itself; the decisions of several States’ highest courts applying Jackson to strike down their statutes, which were substantially similar to New York’s; the People v Michael A. C. decision (supra), which applies the Jackson rationale to a non-capital case; and the fact that apparently no other jurisdiction has a statutory scheme that permits guilty pleas but allows for the imposition of death only after jury trial — the court is led ineluctably to the conclusion that CPL 220.10 (5) (e), 220.30 (3) (b) (vii), and 220.60 (2) (a) do not conform to the requirements of the Fifth and Sixth Amendments to the United States Constitution, and corresponding provisions of the New York Constitution.
The court reaches this decision for the sole reason that any other result is foreclosed by the holding of United States v Jackson (supra). However, the court notes in passing that finding these provisions to be unconstitutional at this juncture, rather than "rubber-stamping” them so that the Court of Appeals may subsequently pass upon their constitutionality years later, serves not only the interests of fundamental fairness, but judicial economy, as well. It makes no sense to permit convic *186 tions under these suspect provisions, only to have those cases reversed upon appeal years later, burdening the courts and the parties with retrials.
In this vein, mindful that the law-making function is left to the Legislature alone, the court respectfully invites the Legislature to consider whether to enact plea provisions to conform with the practices of other States that have constructed statutes to comply with Jackson (supra).
Severability
New York’s death penalty statute contains a saving clause, which provides that: "If any section, part or provision of this act shall be declared unconstitutional or invalid or ineffective by any court of competent jurisdiction, such declaration shall be limited to the section, part or provision directly involved in the controversy in which such declaration was made and shall not affect any other section, part or provision thereof.” (L 1995, ch 1, § 37.) If a statute contains a saving clause, there arises a presumption that the Legislature intended for only the portion of the statute which is deemed to be defective to be stricken. Only if the court concludes that the provision in question cannot be severed from the rest of the statute, or that, notwithstanding the saving clause, the Legislature did not intend for the statute to remain in effect without the particular provision, should the court strike the statute as a whole. As Judge Cardozo stated: "The principle of division is not a principle of form. It is a principle of function. The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots.” (People ex rel. Alpha Portland Cement v Knapp, 230 NY 48, 60.)
Having determined that the plea provisions are unconstitutional, the court must determine whether to strike the death penalty statute as a whole, or whether it will suffice to invalidate only the defective provisions, leaving the remainder of the law in place. The court concludes that the plea provisions may be severed from the remainder of the law, and that there is no reason to conclude that the Legislature did not intend for the statute to remain in effect absent those provisions.
There is no question that CPL 220.10 (5) (e), 220.30 (3) (b) (vii), and 220.60 (2) (a) constitute discrete provisions pertaining *187 only to capital cases. As such, they may be severed without doing injury to the remainder of the Criminal Procedure Law. Nor would severance lead to impermissible results in capital cases.
Since the right to plead guilty is a creature of statute, and is not mandated constitutionally (see, Corbitt v New Jersey, 439 US, supra, at 222-223; cf., People v Melo, 160 AD2d 600 [1st Dept 1990]), the court may strike the contested statues, thereby leaving no provision for guilty pleas in death-eligible cases, and thus curing the constitutional defect. The effect of severing the provisions will be to prohibit pleas in cases in which a notice of intent to seek the death penalty has been filed and is in effect. In cases in which the crime of murder in the first degree is charged and no such notice has been filed, or where the notice has been revoked by the District Attorney, a defendant may plead guilty pursuant to CPL 220.10 (5) (d) (i), which provides for pleas where the charge is a class A felony.
Therefore, CPL 220.10 (5) (e), 220.30 (3) (b) (vii), and 220.60 (2) (a) shall be deemed stricken from the death penalty statute. The defendant’s motion in all other respects is denied.
CPL 320.10 (1)
Consonant with article I, § 2 of the New York Constitution, which provides that, "[a] jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death,” CPL 320.10 (1) provides that a defendant may waive his right to a jury trial, ”[e]xcept where the indictment charges the crime of murder in the first degree”. The defendant claims that he has a constitutional right to opt for a nonjury trial, and that permitting noncapital defendants to waive the right to jury trial violates his right to equal protection. However, while the right to a jury trial "shall remain inviolate forever” (NY Const, art I, § 2; see also, US Const, art III, § 2 [3]), there is no constitutional right to a non-jury trial.
Since the notion that "death is different” has otherwise pervaded the defendant’s motion papers, it is ironic that he argues that his equal protection rights are violated because the provisions of the New York Constitution and CPL 320.10 (1) treat capital defendants differently than other accused persons. In any event, capital defendants may not be considered a suspect class for the purpose of equal protection analysis. (See, Gray v Lucas, 677 F2d 1086, 1104 [5th Cir 1982], supra.) Moreover, there is a rational basis for requiring that, in all trials in *188 which the charged crime may be punishable by death, rather than leaving the defendant’s fate to the judgment of a single individual, the decision should be made by a jury of 12 persons reflecting the conscious and moral judgment of the community.
V. MOTION TO PRECLUDE DEATH QUALIFICATION OF JURY
The defendant seeks a determination that CPL 270.20 (1) (f) — providing that jurors may be challenged for cause when their conscientious opinions, either in favor of or against the death penalty, would interfere with their ability to render an impartial verdict or exercise properly their sentencing discretion — is unconstitutional. In the alternative, the defendant seeks to preclude voir dire regarding potential jurors’ views of the death penalty, or to postpone such questioning until after the guilt phase of the trial has been completed.[25] Finally, the defendant requests that if such questioning is permitted, (1) that it be conducted individually, outside the presence of other potential jurors; and (2) that questions be limited to whether a juror’s opposition to the death penalty would preclude him or her from finding the defendant guilty, and not whether the juror’s opinion would prevent him or her from sentencing the defendant to death.
In support of his motion, the defendant argues, first, that questioning of jurors about their opinions of the death penalty — a process referred to as "death qualification” — results in juries that are more prone to convict, thereby depriving him of his right to an impartial jury. Second, the defendant argues that African-Americans and women are more likely to be excluded from a "death-qualified” jury, thus violating his right to a jury composed of a fair cross section of the community. Further, the defendant contends that the process of death qualification violates his due process rights under the Federal and State Constitutions. Finally, the defendant argues that the prospective jurors’ rights to equal protection and freedom of religion are violated by the practice of death qualification.
The United States Supreme Court has held that jurors who would automatically impose the death penalty, or whose opinions regarding the death penalty would prevent them from properly determining the guilt or innocence of the defendant— so-called "Witherspoon excludables” — may be excluded. (See, Witherspoon v Illinois, 391 US 510 [1968].) "[T]he proper *189 constitutional standard is simply whether a prospective juror’s views would ' " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” ” (Lockhart v McCree, 476 US 162, 167, n 1 [1986], quoting Wainwright v Witt, 469 US 412, 433 [1985], quoting Adams v Texas, 448 US 38, 45 [1980].)
The language of CPL 270.20 closely mirrors the language of these Supreme Court opinions. The relevant portion of the statute reads as follows: "A challenge for cause * * * may be made * * * on the ground that * * *
"The crime charged may be punishable by death and the prospective juror entertains such conscientious opinions either against or in favor of such punishment as to preclude such juror from rendering an impartial verdict or from properly exercising the discretion conferred upon such juror by law in the determination of a sentence pursuant to section 400.27.” (CPL 270.20 [1] [f| [emphasis added].)
The statute must be presumed to be constitutional under both the Federal and State Constitutions and the defendant has the heavy burden of overcoming this presumption. (See, Weems v United States, 217 US 349 [1910], supra; Fenster v Leary, 20 NY2d 309 [1967].) It cannot be gainsaid that the contested statute serves a legitimate State interest: the State must be permitted to remove jurors who would be unable to fulfill their oaths to follow the law as given to them by the court. The defendant has failed to demonstrate that death qualifying the jury violates any provision of the Federal or State Constitution in achieving this goal.
The United States Supreme Court squarely addressed the issue of death qualifying a jury in a capital case in Lockhart v McCree (476 US 162 [1986], supra). The Court addressed both the issue that a death-qualified jury may be more prone to convict and the issue that a death-qualified jury may violate the requirement that a jury be drawn from a fair cross section of the population. The Court found that death qualification was constitutional in both instances. In fact, no court that has considered the issue has found death qualification to violate the Federal, or respective State Constitution. (Falk and Cary, Death-Defying Feats: State Constitutional Challenges to New York’s Death Penalty, 4 J L & Pol’y 161, 206 [1995]; see, e.g., State v Alvarez, 872 P2d 450, 454-455 [Utah 1994]; State v Ramseur, 106 NJ 123, 524 A2d 188, 250-254 [1987].) New York State’s Constitution does not require a contrary result.
The defendant relies on statistical data and studies which purport to establish that a jury that is death qualified is more *190 likely to convict and more likely to believe the prosecution’s evidence than the defendant’s. Many of these studies are the same as those which were scrutinized and rejected by the Supreme Court in Lockhart (supra). In that case the studies were, however, for the purposes of deciding the defendant’s motion, assumed to be accurate. It was therefore assumed that death-qualified juries are more prone to convict, yet the court determined that death qualification was permissible. (Lockhart v McCree, 476 US, at 173.) Therefore, even if subsequent studies submitted by the defendant are presumed to be accurate, the fact that the jury may be more prone to conviction does not rise to a constitutional violation. (Supra.)
Death qualification is necessary to the State’s "concededly legitimate interest” in assuring that jurors sworn to determine the guilt and sentencing of this defendant can do so in accordance with the law and the Judge’s instructions. (Lockhart v McCree, supra, at 175; see also, People v Fields, 35 Cal 3d 329, 673 P2d 680 [1983].) The purpose of the statute is to insure an impartial verdict, the touchstone of any jury trial. No method has been suggested to supplant death qualification in achieving that essential goal. (See, State v Ramseur, 106 NJ 123, 524 A2d, at 253, supra; Rector v State, 280 Ark 385, 659 SW2d 168, 173 [1983].) Moreover, there is no reason to presume that a death-qualified jury, even if more conviction prone, would render a verdict contrary to the facts.[26] In any event, if the defendant is convicted and the jury’s verdict regarding guilt is contrary to the weight of the evidence, there are adequate remedies available to the defendant, thus assuring his due process rights.
Neither is there merit to the defendant’s claim that CPL 270.20 violates his right to a jury composed of a fair cross section of the community. The Supreme Court has set forth the following as the requirements for stating a prima facie case of a Sixth Amendment fair cross-section violation, (1) the group allegedly excluded is distinctive; (2) the group was statistically underrepresented and (3) the group was systematically excluded. (Taylor v Louisiana, 419 US 522 [1975].) In Lockhart, the Court found that "groups defined solely in terms of shared attitudes that would prevent or substantially impair *191 members of the group from performing one of their duties as jurors, such as the ' Mi/ierspoon-excludables’ at issue here, are not 'distinctive groups’ for fair-cross-section purposes.” (Lockhart v McCree, 476 US, supra, at 174.)
However, even if death qualification resulted in the disproportionate exclusion of constitutionally cognizable groups such as women and African-Americans, the motion must still be denied. If a violation of the fair cross-section requirement is established, the State may show a "significant state interest” which must "be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group.” (Duren v Missouri, 439 US 357, 367-368 [1979].) This test is satisfied here. Exclusion of jurors based on their ability to perform their duties and carry out their oaths advances an important goal, and does not discriminate on the basis of membership in a cognizable group, per se. " 'Death qualification,’ unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State’s concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial.” (Lockhart v McCree, 476 US, supra, at 175-176.) As such, it does not violate the Sixth Amendment.
As an alternative to striking down CPL 270.20, the defendant requests that voir dire regarding the jurors’ opinions of the death penalty be conducted prior to the penalty phase, should one be necessary, and not prior to the guilt phase of the trial. Lockhart (supra) dealt specifically with this issue and found death qualification prior to the guilt phase to be constitutional. The Court reasoned that the State had a "legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial.” (Lockhart v McCree, 476 US, at 175-176.) The court can find no reason to reach a different result under the New York Constitution.
The defendant attempts to distinguish Lockhart (supra) by arguing that the case was so decided because the Arkansas statute in question required a single jury to determine guilt and sentence; by contrast, New York’s death penalty statute permits the empaneling of another jury for the penalty phase "only in extraordinary circumstances and upon a showing of *192 good cause”. (CPL 400.27 [2].)[27] However, if the Legislature intended to provide for the procedure sought by the defendant, it could have so provided. It did not. Indeed, CPL 400.27 (2) states, in pertinent part, that "[t]he separate sentencing proceeding provided for by this section shall be conducted before the court sitting with the jury that found the defendant guilty” (emphasis supplied). Thus, it was clearly the Legislature’s intent to have guilt and sentence determined by the same jury in all but the most unusual circumstances. As such, death qualification, to be effective, must precede the guilt phase.
The defendant also requests that the jurors be questioned only as to whether their opinions regarding the death penalty would prevent them from impartially determining the defendant’s guilt. This is not what the statute provides. CPL 270.20 (1) (f) specifically provides that a juror may be dismissed for cause if he or she cannot "properly exercis[e] the discretion conferred upon such juror by law in the determination of a sentence pursuant to section 400.27” (emphasis added). Further, as previously stated, the constitutional standard is whether the juror’s opinions would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” (Adams v Texas, 448 US, supra, at 45.) The State’s constitutional requirements would not differ in this respect.
The defendant’s motion to preclude death qualification must, for the foregoing reasons, be denied in all respects. The court recognizes that a juror may not be excluded for mere general reservations or objections to the death penalty or expressing conscientious or religious "scruples” regarding such sentencing. (Witherspoon v Illinois, 391 US, supra, at 521; Gray v Mississippi, 481 US 648 [1987].) Voir dire will be conducted prior to trial in accordance with these mandates and in a manner that will insure that the defendant will not be prejudiced by the questioning.
VI. MOTION TO PRECLUDE LIFE QUALIFICATION OF JURY
The defendant claims that CPL 270.20 (1) (f) must be struck down because, by its terms, it does not permit the defendant *193 sufficient leeway to "life-qualify” the jury, i.e., to identify and strike those potential jurors who would always impose the death penalty, regardless of any mitigating factors. (See, Morgan v Illinois, 504 US 719, 736 [1992].) Specifically, the defendant claims that the statute permits him only to strike those jurors whose conscientious opinions would "preclude” them from being fair and impartial and from considering alternatives to a death sentence, and not those jurors whose views would "substantially impair” those abilities.
The court does not read the terms of the statute so strictly. It is a fundamental tenet of statutory construction that the court should construe a statute, if possible, so that it is in harmony with constitutional mandates. (See, McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [c].) The court has no difficulty in concluding that the term "preclude” is susceptible of the meaning "prevent or substantially impair”. If a juror’s ability to be fair and impartial and to abide by his or her oath is substantially impaired, no doubt that juror is precluded from so acting. Moreover, the court is aware that the death penalty statute was formulated and enacted in the wake of several United States Supreme Court decisions speaking to the issues raised by the defendant; the Legislature most certainly took these decisions into account in drafting the statute, and intended the terms of the statute to be consistent with them.
The court rejects the defendant’s invitation to craft a rule that jurors whose opinions would "likely impair” their abilities to carry out their duties to be fair and impartial and to exercise their sentencing discretion properly may not be stricken. The defendant’s request has no support in the statute or in case precedent. The standard set forth in the statute and in Supreme Court precedent provides that the defendant may strike those jurors whose opinions will not permit them to decide the case fairly; this provision assures that the defendant’s Sixth Amendment rights will be protected. The court is mindful that it has a " 'serious duty to determine the question of actual bias * * * [and] must be zealous to protect the rights of an accused’ ” (see, Wainwright v Witt, 469 US 412, 429-430 [1985], supra, quoting Dennis v United States, 339 US 162, 168 [1950]), and will act accordingly.
VII. CONCLUSION
Therefore, and for the foregoing reasons, the motion to dismiss the indictment is denied, except that count one is dismissed. All other motions are denied, except that the mo *194 tion challenging the plea provisions is granted to the extent that the plea provisions shall be severed and stricken from the statute.

. In addition, the statute requires that the victim not be a participant in the crime, and that the defendant may not be charged under this section on a theory of accomplice liability unless the defendant commanded another to cause the death of the victim or intended victim. (See, Penal Law § 125.27 [1] [a] [vii].)

. The enumerated felonies are: robbery; burglary in the first degree or second degree; kidnapping in the first degree; arson in the first or second degree; rape in the first degree; sodomy in the first degree; sexual abuse in the first degree; aggravated sexual abuse in the first degree; and escape in the first degree. Subparagraph (vii) also provides that an intentional killing in furtherance of flight after committing or attempting to commit murder in the second degree constitutes murder in the first degree. (See, Penal Law § 125.27 [1] [a] [vii].)

. [1] The People’s claim that counts one and two are permissible by the same logic that permits lesser included offenses pertaining to the same conduct to be charged in an indictment requires little discussion. Counts one and two charge murder in the first degree, a class A-I felony. (See, Penal Law § 125.27 [1] [a] [vii].) Therefore, because the charges are of the same grade or degree, one cannot be considered a lesser included offense of the other. (See, CPL 1.20 [37].)

. The court chooses to dismiss the first degree murder count pertaining to robbery in the first degree, rather than the count pertaining to robbery in the third degree, because the statute refers simply to robbery as an aggravating factor, without any of the additional requirements of a charge of first degree robbery. Because the court has dismissed count one on the ground of *154 multiplicity, it does not reach the defendant’s claim that count one "double-counts” the victim’s death.

. In his motion, the defendant also refers to count one. Because the court has dismissed count one on other grounds, it is not discussed in this section of the opinion.

. Nor can the defendant find support for this argument in cases he cites from other jurisdictions. (See, State v Harris, 141 NJ 525, 662 A2d 333, 351-353 [1995]; State v Richardson, 923 SW2d 301, 308 [Mo 1996]; Commonwealth v Yarris, 519 Pa 571, 549 A2d 513 [1988]; James v State, 453 So 2d 786, 792 [Fla 1984]; Stebbing v State, 299 Md 331, 473 A2d 903, 916-917 [1984].) None of those cases held that defendant may be charged only with a single felony offense as an aggravating factor, thereby limiting the prosecution’s proof of the full extent of the defendant’s conduct. The most that these cases hold is that, under the statutes of the respective jurisdictions, multiple felonies, once established at trial, may constitute a single aggravator for the purpose of the penalty phase. Of course, these courts’ interpretations of their respective jurisdictions’ statutes are not binding upon this court. For the same reason, the Federal cases cited by the defendant are not persuasive, since they are based upon the courts’ interpretation of Congress’ intent with regard to Federal statutes. (See, e.g., United States v Vest, 913 F Supp 1345, 1353 [WD Mo 1995] [Blockburger test for multiplicity is a guide for ascertaining congressional intent].)

. This point is discussed in greater detail in the portion of the opinion resolving the defendant’s motion to strike the death notice.

. Kidnapping in the first degree also occurs when a person abducts another person and when (1) his intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct, or to refrain from engaging in particular conduct; or (2) he restrains the person abducted for a period of more than 12 hours with intent to (a) inflict physical injury upon him or violate or abuse him sexually; or (b) accomplish or advance the commission of a felony; or (c) terrorize him or a third person; or (d) interfere with the performance of a governmental or political function.

. Parker v State (292 Ark 421, 731 SW2d 756 [1987]), cited by the defendant, does not stand for a contrary proposition. In that case, the court overturned defendant’s conviction of capital murder premised upon a killing in the course of a burglary, where, under the particular facts of the case, the burglary was committed in order to facilitate the killing. Thus, the court’s holding was not founded upon double-counting, as the defendant claims, but upon its conclusion that the killing was not "in the course of or in furtherance of’ the burglary. (Supra, 292 Ark 421, 731 SW2d, at 758-759.)

. The defendant’s reliance upon People v Jackson (237 AD2d 620) is misplaced. In Jackson, the Court held that the defendant could not be sentenced consecutively for intentional murder and kidnapping in the first degree, where the murder and the death during the abduction arose from the same conduct. Jackson stands for the proposition that a defendant may not be sentenced consecutively for two separate convictions arising out the same conduct; it does not prohibit overlapping proof of two elements of the same crime, as in defendant Hale’s case.

. The defendant’s argument that the so-called double-counting of the victim’s death "makes it irrationally appear that the crime is more aggravated than it is” requires little discussion. First, for the reasons stated above, the court has determined that the death is not improperly double-counted. Second, it should be apparent that the purpose of any aggravating factor is to establish that a murder is sufficiently atrocious that it deserves capital punishment, and therefore, its very purpose is to distinguish the killing as "more aggravated” than other murders. The defendant cannot complain that he is unduly prejudiced by the jury’s hearing the full scope of his alleged criminal conduct.

. All other felony Trial Judges, with the exceptions of those assigned to the domestic violence court, the juvenile court, and the drug court, are assigned to geographical zones within Brooklyn, and they handle cases arising only out of those zones.

. If there are no preindictment motions in a capital case, the case is assigned randomly by the clerk to one of the six pool Judges after the defendant has been arraigned on the indictment.

. The most that defendant can say is that the system creates an "appearance of impropriety” by creating a subset of Judges to handle death penalty cases. The court cannot fathom how a system which selects a group of Judges based purely upon judicial merit, then assigns cases to those Judges randomly, can be viewed in any way as improper.

. The defendant’s reliance on United States v Escobar (803 F Supp 611 [ED NY 1992]) is misplaced. In Escobar, a Federal District Court Judge granted the defendant’s motion to have another Judge assigned to his case, yet admitted, paradoxically, that the decision was not only unsupported by precedent, but that the administrative rules of the Eastern District expressly rejected such challenges by defendants. (Supra, at 615-616, 618.) Furthermore, the defendant cannot find any support for his claim in Matter of Morgenthau v Cooke (56 NY2d 24 [1982]), which dealt not with the authority to determine the method of random judicial assignment — a power clearly granted to the Chief Administrative Judge — but with the authority to temporarily assign lower court Judges to the Supreme Court in the absence of any procedures approved by the Court of Appeals.

. In support of his motion to strike the death notice, the defendant also claims that New York’s capital punishment legislation is unconstitutional because (1) it cannot be applied without arbitrary, irrational, or "freakish” results; (2) Penal Law § 125.27 is overinclusive; (3) CPL 250.40 gives unfettered discretion to prosecutors to seek the death penalty; (4) the jury’s discretion to impose the death penalty is not guided by sufficient standards; and (5) the broad, unguided discretion of prosecutors to seek the death penalty and of juries to impose it will result in invidious discrimination. Those specific claims are addressed in detail in other parts of the court’s opinion.

. For example, New York goes beyond the requirements mandated by the Supreme Court by requiring that defendants be at least 18 years old to be eligible for capital punishment; limiting death penalty eligible felony murders to those in which the defendant either intentionally killed the victim or commanded the killing; and prohibiting execution of the mentally retarded.

. Both constitutional provisions borrowed from an English statute passed in the first year of the reign of William and Mary, entitled, " 'An act declaring the rights and liberties of the subject, and settling the succession of the crown,’ ” commonly known as the English Bill of Rights of 1689. (See, People ex rel. Kemmler v Durston, 119 NY, supra, at 576; Gregg v Georgia, 428 US, supra, at 169.)

. The court is aware that there have been plea discussions in this case.

. The permissible nondeath sentences for a conviction of murder in the first degree are an indeterminate term of imprisonment of a minimum of 20 to 25 years to a maximum of life, or life without parole. (See, Penal Law §§ 60.06, 70.00 [3] [a] [i].)

. In 1971, in single-paragraph orders that did not elaborate the basis for the decisions — except to say that, "Judgments, insofar as they impose the death sentence, reversed and cases remanded” — the Supreme Court reversed seven death penalty convictions arising out of New Jersey, North Carolina, and South Carolina, citing United States v Jackson (supra) among other cases. (See, 403 US 948 [1971].)

. It may be argued that article I, § 2 can be interpreted to prohibit guilty pleas in capital cases. The provision states, in pertinent part, that "[a] jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death”. (NY Const, art I, § 2.) Since a defendant necessarily waives his right to a jury trial by entering a guilty plea, it is logical to conclude that article I, § 2 forbids guilty pleas in capital cases. This construction would eliminate the concerns voiced in Jackson (supra), because defendants would not be forced to choose between relinquishing their constitutional rights and risking death. All death-eligible defendants would be required to have their cases adjudicated in jury trials, an apparently permissible result under Jackson. (See, United States v Jackson, 390 US, at 584-585 [Court held that requiring all capital defendants to go to trial would not be unconstitutional, but was not intended by Congress when it enacted Federal Kidnaping Act].) However, this interpretation appears to be foreclosed by cases which hold that article I, § 2 guarantees only that if a defendant wishes to exercise his right to a trial, he is entitled to be tried before a jury. However, if a defendant pleads guilty, choosing not to seek a trial, article I, § 2 is not implicated. (See, e.g., People v Hardy, 53 AD2d 647, 648 [2d Dept 1976] [holding that article I, § 2 is not applicable to guilty *180 plea by which defendant elects not to litigate guilt, but instead gives defendant who elects to stand trial the right to obtain trial before court without a jury].) Thus, there appears to be no constitutional impediment to a defendant’s pleading guilty to a death-eligible offense. Neither the People nor the defendant argue otherwise.

. Massachusetts did not reinstate the death penalty.

. In People v Black (34 AD2d 999, affd without opn 30 NY2d 593 [1972], supra) the Appellate Division, in obiter dicta, cited Jackson (supra) for the proposition that where the death penalty may be imposed, when appropriate, only upon a jury verdict of guilty (see, Penal Law former § 125.30), under such a statutory scheme the death penalty is unconstitutional since it needlessly encourages the taking of guilty pleas.

. Of course, if the defendant is not convicted of murder in the first degree, such voir dire would be unnecessary.

. Indeed, it has been suggested that defendants may actually benefit from having guilt and sentencing issues tried before a unitary jury. (See, State v Hughes, 106 Wash 2d 176, 187, 721 P2d 902, 908 [1986] [noting that jurors may harbor " 'whimsical doubts’ ” from the guilt phase that may prevent them from imposing death in the sentencing phase].)

. Contrary to the defendant’s assertion, the mere possibility that a death-qualified jury may be more prone to convict in the guilt phase does not constitute "good cause” for empaneling a different jury for the sentencing phase. To permit such a broad interpretation would be to allow the exception to swallow the rule. (See, State v Ramseur, 106 NJ 123, 524 A2d, at 252, supra.)